THOMAS OTIS LE ROY AND DAVID SMITH, APPELLANTS, *v.* BENJAMIN TATHAM, JUN., HENRY B. TATHAM, AND GEORGE N. TATHAM.

The patent of the Tathams, for an improvement upon the machinery used for making pipes and tubes from lead or tin, when in a set or solid state, explained and sustained.

*Le Roy et al.* v. *Tatham et al.*

THIS was an appeal from the Circuit Court of the United States for the southern district of New York, sitting in equity.

It was a bill filed by the Tathams against the appellants, for an infringement of the patent for making lead pipe, which is particularly described in a former case reported in 14 Howard, 156.

The Circuit Court decreed that John Hanson and Charles Hanson, of England, were the first and original inventors and discoverers of the improvement in making pipes and tubes from metallic substances, set forth and described in the bill of complaint.

That the subject matter of the said invention and discovery is patentable.

That the complainants are the legal patentees and owners, within the United States, of the said invention and discovery, set forth in the bill of complaint, which sufficiently describes the same.

That the defendants have infringed and violated the said patent right of the complainants in the manner charged in the bill of complaint.

The court thereupon ordered a reference to a master to take an account of the damages sustained by the complainants. Upon the coming in of his report, sundry exceptions were filed by the defendants, which were overruled, and the court decreed the amount which the defendants should pay. An appeal from this decree brought the case up to this court.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. Stoughton* and *Mr. Noyes* for the appellants, and by *Mr. Keller* and *Mr. Goddard* for the appellees.

The principal ground upon which the counsel for the appellants sought to reverse the decree was, that the patent to the complainants was void, because the Hansons were not the original and first inventors of the improvements therein described and claimed.

The discussion of this proposition filled the court room with models and machines upon both sides, the description of which

would be of little interest to the readers of this volume. They will be, therefore, entirely passed over.

Mr. Justice McLEAN delivered the opinion of the court.

This is an appeal from the final decree of the Circuit Court of the United States for the southern district of New York, on a bill filed by the appellees to restrain the infringement by the appellants of a patent for making lead pipe, and for general relief.

A suit at law was commenced, after the filing of the bill, on or about the 10th of May, 1847, to recover damages for the same infringement.

This action was twice tried—once on the 3d May, 1848, and resulted in a verdict for the appellants, which was set aside by the court, and a new trial awarded. It was tried in May, 1849, when the jury gave a verdict for the respondents for $11,394 in damages. Exceptions were taken to the charge, and the judgment was reversed, and a new trial ordered in December term, 1852. 14 How., 156.

Before this decision was made, and in January, 1852, it was stipulated between the counsel for the respective parties that the testimony taken on the last trial in the action at law should be read; and it forms the principal part of the evidence on both sides in this suit.

The action at law was not to be tried again; but the suit in equity was prosecuted in its stead.

The patent under which the plaintiffs claim bears date the 14th March, 1846; and in their schedule they say: "Our invention consists in certain improvements upon and additions to the machinery used for manufacturing pipes and tubes from lead or tin, or any alloy of soft metals, capable of being forced, by great pressure, from out of a receiver, through or between apertures, dies, and cores, when in a set or solid state, set forth in the specification of a patent granted to Thomas Burr, of Shrewsbury, in Shropshire, England, dated the 11th of April, 1820, recited in the Repertory of Arts, &c., London, &c."

The bill alleges that John and Charles Hanson, of England, were the inventors of the improvements specified, on or prior

to the 31st of August, 1837; that on the 10th of January, 1840, the Hansons assigned to H. B. & B. Tatham, two of the defendants in error, the full and exclusive right to said improvements; that on the 29th March, 1841, letters patent were granted for the improvements to the Tathams, as the assignees of the Hansons; that afterwards H. B. & B. Tatham assigned to G. N. Tatham, the remaining defendant, an undivided third part of the patent.

On the 14th March, 1846, the said letters patent were surrendered, on the ground that the specifications of the improvements claimed were defective; and a new patent was issued, which granted to the patentees, their heirs, &c., for the term of fourteen years from the 31st August, 1837, the exclusive right to make and vend the improvements secured.

The defendants denied the infringement charged.

A great number of facts were proved, showing the successful manufacture of lead in the mode stated in the specifications, and particularly that "pipes thus made are found to possess great solidity and unusual strength, and a fine uniformity of thickness and accuracy is arrived at, such as, it is believed, has never been attained by any other machinery." And they say the essential difference in the character of this pipe, which distinguishes it, as well as that contemplated by Thomas Burr, from all others heretofore known or attempted, is, that it is wrought under heat, by pressure and constriction, from set metal, and that it is not a casting formed in a mould.

"And it was proved, that in all the modes of making lead pipe previously known and in use, it could be made only in short pieces; but that, by this improved mode, it could be made of any required length, and also of any size; and that the introduction of lead pipe made in the mode described had superseded the use of that made by any of the modes before in use, and that it was also furnished at a less price." And it was proved that lead, when recently become set, and while under heat and extreme pressure, in a close vessel, would reunite perfectly after a separation of its parts.

In the case of the Househill Company *v.* Neilson, Webster's Patent Cases, 683, it is said: "A patent will be good, though

the subject of the patent consists in the discovery of a great, general, and most comprehensive principle in science or law of nature, if that principle is, by the specification, applied to any special purpose, so as thereby to effectuate a practical result and benefit not previously attained."

Mr. Justice Clerk Hope, in his charge to the jury, said: "The specification does not claim anything as to the form, nature, shape, materials, numbers, or mathematical character, of the vessel or vessels in which the air is to be heated, or as to the mode of heating such vessels."

Now, in this case it must not be forgotten that the machinery was not claimed as a part of the invention; but the jury were instructed to inquire "whether the specification was not such as to enable workmen of ordinary skill to make machinery or apparatus capable of producing the effect set forth in said letters patent and specification;" and that, in order to ascertain whether the defendants had infringed the patent, the jury should inquire whether they "did, by themselves or others, and in contravention of the privileges conferred by the letters patent, use machinery or apparatus substantially the same with the machinery or apparatus described in the plaintiffs' specification, and to the effect set forth in said letters and specification."

Now, as no specification was claimed in regard to the machinery, it is not perceived how the patent could be infringed, unless upon the principle that, having claimed no specific mode of applying the heat, he could use any mode he might prefer, in defiance of the rights of other patentees.

Now, this cannot be law; certainly it is not law under the patent act of this country. That act requires the making and constructing "the thing, in such full, clear, and exact terms as to enable any person, skilled in the art or science to which it appertains, to make, construct, and use the same."

Alderson B. Webster's Patent Cases, 342, says: "The distinction between a patent for a principle and a patent which can be supported is, that you must have an embodiment of the principle in some practical mode described in the specification of carrying into actual effect; and then you take out

your patent, not for the principle, but for the mode of carry-
ing the principle into effect."

"It is quite true, that a patent cannot be taken out solely for
an abstract philosophical principle—for instance, for any law
of nature or any property of matter, apart from any mode of
turning it to account. A mere discovery of such a principle
is not an invention, in the patent-law sense of the term."
Web. Cases, 683.

However brilliant the discovery of the new principle may
be, to make it useful it must be applied to some practical pur-
pose. Short of this, no patent can be granted. And it would
not seem to be a work of much labor for a man of ingenuity
to describe what he has invented.

The "newly-discovered property in the metal, and the prac-
tical adaptation of it, by these means, to the production of a
new result, namely, the manufacture of wrought pipe out of
solid lead," was the discovery. "There can be no patent for
a principle; but for a principle so far embodied and connected
with corporeal substances as to be in a condition to act and to
produce effects in any trade, mystery, or manual occupation,
there may be a patent."

"It is not that the patentee conceived an abstract notion
that the consumption in fire-engines may be lessened; but he
discovered a practical manner of doing it, and for that he has
taken his patent. This is a very different thing from taking
a patent for a principle."

The principle may be the new and valuable discovery, but
the practical application of it to some useful purpose is the
test of its value.

In the case of Leroy v. Tatham, 14 How., 136, it was said,
"that in the view taken by the court in the construction of
the patent, it was not material whether the mere combination
of machinery referred to were similar to the combination used
by the Hansons, because the originality did not consist in the
novelty in the machinery, but in bringing a newly-discovered
principle into practical application, by which a useful article
is produced, and wrought pipe made, as distinguished from
cast pipe."

Now, it must be observed that the machinery used was admitted to be old, and any difference in form and strength must arise from the mode of manufacturing the pipes. The new property in the metal claimed to have been discovered by the patentees belongs to the process of manufacture. The result is before us. We see the manufactured article, and are told that its substance is greatly modified and improved, but we derive little or no knowledge from inspecting it. Except by the known process of its formation, we cannot appreciate its value, or comprehend the various purposes for which it was made. We want to see and understand the processes by which it was formed, the machinery in action, and a full explanation of its parts.

The claimants say: "We wish it to be understood that we do not confine ourselves to the mode of operation herein described, by making the cylinder rise with the hydraulic ram and other parts, and keeping the piston stationary, as the same effects will take place when the cylinder is stationary, and the power of the ram is applied to the top of the piston to cause it to descend into the cylinder, and our improvements might be applied to a cylinder and press, fitted up in other respects upon Burr's plans, whereby the pipe is received over the top of the machinery, &c., all which and other variations will readily suggest themselves to any practical engineer, without departing from the substantial originality of our invention.

"The combination of the following parts above described is claimed, to wit, the core and bridge, or guide-piece, with the cylinder, the piston, the chamber, and the die, when used to form pipes of metal, under heat and pressure, in the manner set forth, or in any other mode substantially the same."

To the above is added: "We do not claim as our invention and improvement any of the parts of the above-described machinery, independently of their arrangement and combination above set forth."

The machinery described in both the above sentences is only claimed when used to form pipes of metal under heat and pressure. And it must be admitted, that the machinery described and illustrated by the drawings is sufficiently explicit to show

the nature of the invention. If it be admitted that the machinery, or a part of it, was not new when used to produce the new product, still it was so combined and modified as to produce new results, within the patent law. One new and operative agency in the production of the desired result would give novelty to the entire combination.

The specifications are drawn with care and no ordinary skill, and they cannot be misunderstood. No one can be supposed to mistake the new product for the machinery through which it is developed. And in regard to a practical application of the new conception, it is as necessary as the conception itself; and they must unite in the patent. "The apparatus described is properly regarded by the patentees as subordinate, and as important only as enabling them to give practical effect to the newly-discovered property, by which they produce the new manufacture." Certainly no comparison was instituted between the mechanical contrivance used, and the new discovery.

In the case of Leroy v. Tatham, 14 Howard, 176, the court instructed the jury, "that the originality of the invention did not consist in the novelty of the machinery, but in bringing a newly-discovered principle into practical use."

Principle is often applied to a machine to describe its movements and effect; and we are told that the originality of this invention did not "consist in the novelty of the machinery, but in bringing a newly-discovered principle into practical effect." Whether the new manufacture was the result of frequent experiments or of accident, it will be admitted that the process has been demonstrated to the satisfaction of all observers; and this has been done in the mode described.

In the complicated and powerful machinery used to produce this result, it is not perceived why it should not be adverted to, as showing the most natural and satisfactory explanation of the discovery. It is only necessary to examine the machinery combined, to see that its parts are dissimilar to others in use; and there would seem to be no other reason for the use of the new principle, to the exclusion of the mechanical structures employed, except a higher reach of knowledge

However this may be, it would seem that, when dealing with a patentable subject, its appropriate name should be given to the machinery by which it was developed. The admitted want of novelty in the machinery, referred to so frequently, might invite criticism, if it were necessary, to the case in 14th Howard; but the case now before us is in chancery, and has been deliberately considered.

Up to the year 1837, the date of Hanson's invention, two methods only were known of making wrought pipe from lead, in the set or solid state, and these were the Burr method and the draw-bench method. As soon as the plan of the Hansons was introduced, they superseded all other methods.

Both of the above methods were defective—the draw-bench on account of the great labor, limited length of pipe produced, and unequal thickness; and the Burr, because of the difficulty of holding the core central in the die, in forming pipes of small calibre.

The superiority of the Burr method, for the general purposes of manufacturing leaden pipes which require different sizes to be made, was so slight, as it seems, that for seventeen years after the date of the Burr patent, not one of such machines was put in use in the United States or in Europe.

In this combination of machinery there are six essential parts:

First. A metal cylinder, capable of receiving the lead in a fluid state, and permitting it to become set or solid therein, and of great strength.

Second. A piston, which is a solid metallic body, fitted to the bore of the cylinder, to work therein accurately, to prevent the charge of lead from escaping around it, and so connected with a hydraulic press, or other motor of great power, as to traverse the length of the cylinder with a force applied of several tons, to force out the charge of lead not in the liquid state.

Third. A die, which is simply a block of steel, with a central hole of a cylindrical form, and of a diameter of the pipe to be made.

Fourth. A core, which is simply a short cylindrical rod of steel, of the diameter of the calibre of the pipe to be made.

Fifth. A bridge or core-holder, which is a plate of metal with apertures, having four or more arms radiating from the central part, which has a central hole of the size of the core.

Sixth. A chamber of construction, located between the bridge and the die, and extending from the one to the other, and either conical or cylindrical, provided the end next the bridge be made of greater diameter than the die.

It is rare that so clear and satisfactory an explanation is given to the machinery which performs the important functions above specified. We are satisfied that the patent is sustainable, and that the complainants are entitled to the relief claimed by them.

### ORDER.

The cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the southern district of New York, and was argued by counsel; on consideration whereof, it is the opinion of this court that the complainants in the court below are entitled to recover from the defendants the sum of $16,815.57. Whereupon, it is now here ordered, adjudged, and decreed, by this court, that the same is hereby affirmed to the extent of the aforesaid sum of $16,815.57, and that it be reversed as to the residue; and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to enter a decree for that amount in favor of the complainants. And it is further ordered and decreed by this court, that the costs in the court below be paid by respondents in that court, the appellants here, and that each party pay his own costs in this court.