WESTERN WILLITE CO. et al. v. TRINI-
DAD ASPHALT MFG. CO. et al.

(Circuit Court of Appeals, Eighth Circuit.
December 8, 1926.)

No. 7186.

1. Patents ⏀22—Selection of better, but equivalent, material is not "invention," when difference is only one of degree.

The selection from known equivalent materials of one which does the work better than others previously used and known does not amount to "invention," when the difference is only one of degree.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

2. Patents ⏀72—Patent may be anticipated by prior patents, using not the same, but equivalent, elements in combination.

A patent for a paving composition, specifying mineral asphalt in combination with sulphate of copper as a hardening material, may be anticipated by prior patents, which, though not specifying the exact combination, use equivalent metallic salts as hardening agents in combination with analogous bituminous substances.

3. Patents ⏀26(2)—That better result is obtained by new combination of old elements does not necessarily show invention.

Where all the elements of a patented combination, or their equivalents, have been previously employed in some combination for the production of the same or a kindred product, and their functions remain unchanged, that the new combination accomplishes a better result does not evidence invention.

4. Patents ⏀22—Where reactions of chemical elements are well understood, the usual rule as to equivalents applies.

While the reactions and phenomena of chemistry may sometimes dictate a rule as to equivalents at variance to that rule as applied to physical or mechanical equivalents, it is only when the reactions and phenomena of chemistry are latent and undeveloped, and not where they are well understood.

5. Patents ⏀35—Extensive use will be considered on issue of invention only in doubtful cases.

Extensive use of patented article is strong proof of utility, but not of invention, and is entitled to consideration on that issue only in doubtful cases.

6. Patents ⏀328—Willis, 1,190,615, for plastic composition, held void for anticipation.

The Willis patent, No. 1,190,615, for a plastic composition for use in making pavements, etc., *held* void for anticipation in the prior art.

Appeal from the District Court of the United States for the Eastern District of Missouri.

Suit in equity by the Western Willite Company and others against the Trinidad Asphalt Manufacturing Company and others. Decree for defendants, and complainants appeal. Affirmed.

Livingston Gifford, of New York City (Delos G. Haynes, of St. Louis, Mo., and J. Granville Meyers and T. J. Johnston, both of New York City, on the brief), for appellants.

Harrison F. Lyman, of Boston, Mass. (H. L. Kirkpatrick and Fish, Richardson & Neave, all of Boston, Mass., and Cook & McCauley, of St. Louis, Mo., on the brief), for appellees.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and JOHN B. SANBORN, District Judge.

VAN VALKENBURGH, Circuit Judge. Appellants, complainants below, brought suit in the District Court for the Eastern District of Missouri against appellees, defendants below, alleging infringement of letters patent 1,190,615, dated July 11, 1916. This patent was issued to the applicant, Harry Parsons Willis, and by him assigned to the Western Willite Road Construction Company of America, one of the appellants herein. Subsequently said Western Willite Road Construction Company granted an exclusive license for the state of Missouri to Western Willite Company, which, in turn, granted an exclusive license for that state to Missouri Willite Company. The two latter companies named are co-complainants and appellants herein.

The bill of complaint further alleges said letters patent numbered 1,190,615 were for a so-called plastic composition having for its stated object "to provide an improved composition for use in pavements, paving blocks, sidewalks, stable floors, railroad ties, reservoir linings, drain pipes, building blocks, and other substantial articles exposed to the effects of heat, cold, and moisture." The application for this patent was filed December 7, 1914, and July 10, 1916, the said Willis made application for letters patent upon "asphaltic pavement and foundation for pavements." This application was filed as a division of the application filed December 7, 1914, which later became patent 1,190,615. This divisional application of June 10, 1916, finally, on January 20, 1920, resulted in letters patent 1,328,310. The bill of complaint charged infringement also of this later patent, but, shortly before trial of the case, complainants formally withdrew said patent and announced that they would not charge infringement thereof. The bill further charged infringement of a trade-mark consisting of the word

"Willite" in Gothic letters. The trial court found no sufficient evidence as to the infringement of this trade-mark, and none is urged in this appeal. The patent in suit contains seven claims. Nos. 1, 2, 5, and 7 are in issue; they read as follows:

"1. A plastic composition, comprising a finely divided filler, a mineral asphaltic binder, and sulphate of copper.

"2. A plastic composition, comprising 80 to 90 per cent. of finely divided filler, 10 to 20 per cent. of mineral asphaltic binder, and a small percentage of sulphate of copper."

"5. A plastic composition, comprising a finely divided filler, a mineral asphaltic binder, and sulphate of copper, all of the ingredients being intimately mixed in a highly heated condition."

"7. A plastic composition, comprising a finely divided filler and a mineral asphaltic binder impregnated with sulphate of copper."

At the beginning of the year 1924 the city of St. Louis called for bids in due form for the paving of a section of Pendleton avenue, in said city, under certain specifications prescribing "Willite." These specifications were formulated by appellants and are claimed to embody the invention described and claimed in letters patent 1,190,615. At the letting the appellee Trinidad Asphalt Manufacturing Company was the lowest bidder and received the contract. It declined, however, to become a licensee of appellant Missouri Willite Company and to buy the materials for the paving from that company. The answer assails the validity of the patent and denies infringement in any event.

Upon final hearing the trial court adjudged the patent invalid for anticipation and dismissed the bill. Inasmuch as this ground, assigned by the court as the controlling reason for its action, is the point to which arguments and briefs are more seriously directed, it will receive first consideration.

The gist of the ruling is that, even if prior patents "have never used sulphate of copper, the use of other metallic sulphates would render the patent to Willis invalid on account of the well-known doctrine of equivalents." Full understanding of the application of this language requires an examination of the specifications and claims of the patentee and those of prior patents cited and considered as sustaining the defense of anticipation. The patent in suit is for a "plastic composition." The specification states that:

"This invention has for its object to provide an improved composition for use in pavements, paving blocks, sidewalks, stable floors, railroad ties, reservoir linings, drain pipes, building blocks, and other substantial articles exposed to the effects of heat, cold, and moisture. The composition comprises a finely divided filler, composed of any soil, earth matter, or mixture thereof, a mineral asphaltic binder, and a salt having the tempering or hardening characteristics of sulphate of copper, when combined with the other ingredients of the composition. * * *

"For the binder I use a mineral asphaltic material. With the binder I mix a small percentage of a salt such as sulphate of copper. This sets the binder and hardens it, so as to make it practically as hard as cement concrete. It is the use of this salt, which permeates the entire composition, which makes it practicable to use the cheap filler. The whole mass becomes a chemical composition, having certain characteristics which, in contradistinction to all pavements of bituminous character known to me, prevents its flow in hot exposures, its cracking in cold exposures and its material absorption of water in moist exposures. * * * Though I have described with detail a specific use, composition, and method embodying my invention, yet it is to be understood that the invention is not restricted to this particular use, percentage, or method."

The claims in issue have already been set out.

Among the prior art patents cited, relied upon, and considered are Dotch et al., for an improved composition for paving, roofing, and for other purposes; Dubbs, for the method of manufacturing asphaltum; Doty, for improvement in artificial stone; Ketcham, for a paving composition; Murdock, for a vulcanite paving compound; Day (British), for a paving compound; Pinner, for an improved roofing compound, which he declares to be applicable to various other things, including the cementing together of paving stones in streets; Stuart, for an improvement in compositions for roofing, paving, etc.; Davis, for an improved composition for pavements; Clarke, for an improved composition for pavements, roofing, etc.; McCoy, for a composition for roofing, etc.; Saunders, for improvement in composition for paving; Chase, for a process of manufacturing artificial stone. Many other patents are cited and set out in the record, but is is believed that the foregoing will be sufficient for the solution of the problem presented.

In these various patents are disclosed compositions comprising certain generally described mineral or earthy aggregates combined with various bituminous and pitchy materials, such as asphaltum grahamite, petro-

leum residuums, the different mineral resins, wood tar, coal tar, Barbadoes tar, coal tar pitch, hydrocarbons having an asphaltic base (such as mineral tar), rosin, gas tar, waste oils, etc., to which are added variously, for hardening purposes, sulphur in combination with metallic bases, sulphate of copper, sulphate of iron, sulphate of calcium, oxides of iron with sulphur added, sulphuric acid, barium sulphate, aluminium potassium sulphate, copperas, blue vitriol, and bluestone, the two last being recognized terms for copper sulphate. The court held that these combinations, described in the prior art, deprived the patent in suit of the essential quality of invention under the doctrine of equivalents.

Appellants complain that this doctrine is not applicable for the following main reasons:

(1) That there is a distinction between asphaltum and many of the other bituminous materials employed, particularly those of vegetable origin. The patent specifies a mineral asphaltic material.

(2) That the various salts described are not, in a true sense, the equivalents of sulphate of copper as used in combination, and the patent specifies only sulphate of copper.

(3) That a number of the prior art disclosures are in a different art.

(4) That no patent cited in anticipation discloses the use of mineral asphalt and sulphate of copper in combination.

(5) That "reasoning by analogy in a complex field like chemistry is very much more restricted than in a simple field like mechanics"; therefore, that the doctrine of equivalents is improperly applied.

Of the prior patents to which reference has been made, those of Ketcham, Murdock, Day, Davis, and Saunders specify paving alone. McCoy deals only with roofing. Dubbs and Chase concern the manufacture of asphalt and artificial stone, the same being designed, among other things, for paving use. Those of Dotch, Pinner, Stuart, and Clarke have for their object both paving and roofing. Dotch, Dubbs, Ketcham, Murdock, Day, Pinner, Stuart, and Clarke all specify asphalt. McCoy specifies rosin and petroleum residuum. Saunders specifies resin, pitch, and gas tar. Chase uses rosin. The three last named employ sulphate of copper as a hardening agent. All of the patentees above named use some one or more of the metallic salts for the same purpose.

Now, as to appellants' first contention, it becomes material to consider the essential qualities of asphalt as compared with other bituminous substances. It is defined as mineral pitch. It is classed as a variety of bitumen, being chiefly a mixture of hydrocarbons, but varying in composition, and is probably formed as a residue by the evaporation of petroleum. It is mined as a natural substance found along the Dead Sea, in Lake Trinidad, and elsewhere, and it is manufactured or produced artificially by a treatment of petroleum. It is widely used in making pavements and roofing.

Bitumen is defined as a mineral pitch; a black, tarry substance. It occurs as an abundant natural product in many places, as on the shores of the Dead and Caspian Seas. It is used in cements, in the construction of pavements, etc. By extension, the term includes any one of the natural hydrocarbons, including the hard, solid, brittle varieties called asphalt, the semi-solid maltha and mineral tars, the oily petroleums, and even the light, volatile naphthas. Such are the definitions laid down in dictionary and encyclopedia. It appears conclusively from the record that the effect of metallic salt for hardening purposes, as employed in the patent in suit, is the same when applied to the various bituminous substances, including asphalt, used and described in the prior art patents and the patent in suit, differing, if at all, only in degree. In his original specification submitted to the Patent Office, when applying for the patent in suit, the patentee specified "a tarry, pitchy, or bituminous material," instead of the mineral asphaltic material which now appears in the claims. For the foundation he preferred dehydrated tar; for the binder, bitumen or a bituminous compound. He thereby admits that the effect of the mineral salt upon these different substances is substantially the same. It would seem immaterial, then, that all the patents in suit, which use sulphate of copper as a hardener, do not in terms specify asphaltum.

[1] 2. The court below found "that the chemical reactions, if they are such, or the catalytic effect, if this be the fact, are the same in the case of all the metallic sulphates." This the record seems to establish. It is contended, however, that there is a difference in the degree of effectiveness; this, if true, cannot aid appellants. The selection from known equivalent materials of one which does the work better than others previously used and known does not amount to invention, when the difference is only one of degree.

"A mere carrying forward of an original conception patented, a new and more extended application of it, involving change only of form, proportions, or degree, the substitution of equivalents doing the same thing as did the

original invention by substantially the same means with better effects, is not such invention as will sustain a patent. It is the invention of what is new, and not the arrival at comparative superiority or greater excellence in that which was already known, which the law protects as exclusive property and which it secures by patent." Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566.

In Sloan Filter Co. v. Portland Gold Mining Co., 139 F. 23, Judge Hook, speaking for this court, said:

"The mere use of known equivalents for some of the elements of prior structures; the substitution for one material of another known to possess the same qualities, though not to the same degree; the mere carrying forward or more extended application of the original idea, involving a change only in form, proportions, or degree, and resulting in the doing of the same work in the same way and by substantially the same means—is not patentable, even though better results are secured."

To the same effect, see Lehman v. Ripley (C. C. A. 8), 3 F.(2d) 518; Pittsburg, etc., Co. v. Seaman-Sleeth (C. C. A. 3), 248 F. 705; Continental Fibre Co. v. Formica Insulation Co. (C. C. A. 6) 287 F. 455–459; Rodman Chemical Co. v. Steel Treating Equipment Co. (C. C. A. 6) 288 F. 471–475.

But the patentee himself furnishes convincing proof that the various metallic salts under consideration are equivalents for the purpose for which they are employed in this patent. It will be remembered that patent No. 1,328,310, for asphaltic pavement and foundation for pavements, issued January 20, 1920, was granted under a divisional application from that which resulted in the patent in suit. This is stated in the specification of patent No. 1,328,310. When this application was before the Patent Office, the intimate relationship between the subject-matter of the two applications was thus voiced by the examiner:

"The bearing of applicant's patent (1,-190,615) on the present case is understood to be merely this: That applicant, having already obtained a patent for a composition of matter for use in 'pavements, paving blocks, sidewalks, stable floors, railroad ties, reservoir linings, drain pipes, building blocks, and other articles,' he is not now entitled to another patent for the use of such material for a pavement."

From the file wrapper and contents of the patent in suit it appears that the patentee originally named his proposed product "improved paving composition," a name after-

ward changed to "plastic composition." It is undeniable that the two patents are intimately related and spring from the same original conception. Patent No. 1,328,310 was originally included in this bill as infringed. We may therefore have recourse to the specification of this later patent for additional light upon the question of equivalents, wherein the patentee states:

"My improved asphaltic pavement and foundation for pavements comprises a finely divided filler, composed of any sand, soil, or earthy matter of any kind, or mixture thereof, a mineral asphaltic binder, and a salt having the tempering or hardening characteristics of sulphate of copper, such for instance as the sulphates or selenates of aluminium, chromium, manganese, iron, indium, gallium, and sulphates or selenids of sodium, potassium, rubidium, cæsium, ammonium, silver, gold, platinum, or thallium, when combined with the other ingredients of the pavement, or foundation for pavements. * * * With the binder I mix a small percentage of a salt, such as sulphate of copper, or any of those above mentioned. * * * In the claims hereto annexed I have specified sulphate of copper specifically, but it is to be understood that in specifically stating sulphate of copper I have in mind all of its equivalents, so that the claims are to be construed as referring to sulphate of copper or its equivalents, when combined as therein set forth."

As a matter of fact, in the annexed claims sulphate of copper is not specified, but, instead, "a mineral salt having toughening or tempering properties," and "having the characteristic of tempering the binder." It would seem that the patentee still had in his mind the patent in suit in which sulphate of copper is specified. That the effects of the metallic salts enumerated are the same as employed in this art is established beyond dispute.

3. The court below laid especial stress, in its memorandum, upon the prior patents of Chase, Saunders, and McCoy, all of which use sulphate of copper, but did not deal specifically with pavements. Appellants contend that patents involving roofing and similar uses, as does that of McCoy, belong to another art. But a number of these patents, to wit, those of Dotch, Pinner, Stuart, and Clarke, deal with both paving and roofing, that of Saunders deals directly with paving, and that of Chase is for a process for the manufacture of artificial stone, a product adapted to a use analogous to that of paving. Clearly, all these patents, to which reference has been made, belong to the same or a kin-

dred art, and are legitimate references in the matter of anticipation.

[2] 4. In such case it is immaterial that some of the patents cited do not specify asphalt in combination with sulphate of copper. They all deal with equivalent metallic salts employed as hardening agents in combination with analogous bituminous substances. All the elements in this alleged invention are old; all function in the same manner as in former combinations in which they have been used. Judge Baker, for the Circuit Court of Appeals of the Seventh Circuit, has stated the rule with exceptional clearness. He says:

It is not necessary, in order to deprive a combination claim of novelty, "that all of its elements [shall] have been used together before, and in the same relation * * *. In determining whether a new combination of old elements constitutes invention, the most important and controlling considerations are the intrinsic novelty and utility of the concrete invention." Kelly et al. v. Clow et al., 89 F. 297. He quotes from a prior decision of the same court, to wit, Lumber Company v. Perkins, 80 F. 528–531: "That the mere bringing together, in a new combination, of old devices or elements, especially if they belong to the same art or to arts kindred to that to which the combination belongs, does not constitute invention is well settled. 'It is not enough that a thing shall be new, in the sense that in the shape or form in which it is produced it shall not have been before known and that it shall be useful, but it must, under the constitution and the statute, amount to an invention or discovery.' "

[3] All the elements in this patent, or their equivalents, have been frequently employed in some combination for the production of the same or a kindred product; their functions remain unchanged. In the present combination it is claimed that a better result is obtained, but this does not amount to invention. As said by the Supreme Court in Smith v. Nichols, supra, and by Judge Hook in Sloan Filter Co. v. Portland Gold Mining Co., supra, it involves the mere carrying forward, or more extended application of, an original idea involving a change only in form, proportion, or degree, and resulting in the doing of the same work in the same way and by substantially the same means. Also by the Supreme Court in Florsheim v. Schilling, 137 U. S. 64, 11 S. Ct. 20, 34 L. Ed. 574: "A new arrangement or grouping of parts or elements of a patented article, which is the mere result of mechanical judgment, and the natural outgrowth of mechanical skill, is not invention."

It required no inventive genius to select a bituminous substance, a mineral aggregate or filler, and a metallic salt as a hardening agent —all well known in the prior art—to produce a result differing, if at all, only in degree from that already known and obvious.

[4] 5. It is true, as the trial judge recognized, that "ordinarily, the reactions and phenomena of chemistry may sometimes dictate a rule as to equivalents, which is at variance to that rule as applied to mere physical or mechanical equivalents." But, as he said, we are "unable to see any reason for applying a different rule in a case wherein the effect produced by one metallic sulphate is in all respects similar to those produced by other metallic sulphates," especially when operating in combination upon substances possessing well-known characteristics. It is only when the reactions and phenomena of chemistry are latent and undeveloped that the rule invoked by appellants has application.

[5] In support of their patent, appellants devote much time and space, in argument, record, and brief, to the utility claimed for the patented composition; this claim is vigorously contested by appellees. The significance of usefulness to the validity of a patent is well understood. A patent will not be declared void for lack of utility, if it possesses any utility whatsoever. Gibbs v. Hoefner et al. (C. C.) 19 F. 323. Extensive use of a patented article is strong proof of utility, but not of invention, and is entitled to consideration, on that issue, only in doubtful cases. National Hollow Brake-Beam Co. et al. v. Interchangeable Brake-Beam Co. (C. C.) 99 F. 758. Where the question of novelty is fairly open for consideration, the fact that a patented device has gone into immediate and general use, and has displaced and superseded other devices, is persuasive evidence that it involves invention, and may be sufficient to turn the scale and support the presumption of patentability arising from the grant of the patent. National Hollow Brake-Beam Co. et al. v. Interchangeable Brake-Beam Co. (C. C. A. 8) 106 F. 693; Thomas Roberts Stevenson Co. v. McFassell (C. C. A. 3) 90 F. 707. But such evidence is inconclusive and insufficient, where the changes made from the prior art are mere changes of mechanical construction, or of form, size, or materials. Klein v. City of Seattle (C. C. A. 9) 77 F. 200.

The extent to which a patented device has gone into use is not always a safe criterion, even of its actual utility (McClain v. Ortmayer, 141 U. S. 419–428, 12 S. Ct. 76, 35 L. Ed. 800); and it is generally recognized that commercial success, to be of consequence in this respect, must result directly from the

merit of the article and be attributable to the claims in suit. (Butler Bros. v. Pratt [C. C. A. 8] 253 F. 654–656; Apple v. American Shoe Machinery & Tool Co. [C. C. A. 8], 232 F. 603; Harvey Hubbell, Inc., v. General Electric Co., 267 F. 564–568 [C. C. A. 2]; Consolidated Electric Mfg. Co. v. Holtzer [C. C. A. 1] 67 F. 907). "The mere fact that a patented article is popular and meets with large and increasing sales is unimportant when the alleged invention is clearly without patentable novelty." Duer v. Corbin Cabinet Lock Company, 149 U. S. 216, 13 S. Ct. 850, 37 L. Ed. 707. There must be present a creative mental conception as distinguished from "the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice." American Road Machine Co. v. Pennock & Sharp Co., 164 U. S. 26–41, 17 S. Ct. 1, 7 [41 L. Ed. 337]; Hill v. Wooster, 132 U. S. 693, 10 S. Ct. 228, 33 L. Ed. 502.

Measured by these rules, appellants' device fails to meet the test. It is in evidence that in the 10 years since the issue of the patent in suit approximately 10,000,000 square yards of Willite pavement have been laid, an average of 1,000,000 square yards per year; but it is likewise in evidence that in one of these years alone there were laid 112,000,000 square yards of asphalt pavement of all types, not including the concrete pavements of different character. It thus appears that the patented composition, as applied to pavements, has neither gone into wide general use, nor displaced other forms of pavement which had previously been used. In fact, its use falls far short of evidencing a demand which the prior art was not adequate to supply. The effect of that use upon the validity of the patent, even though that were doubtful, may be disregarded.

[6] The Examiner of the Patent Office evidently became impressed by the alleged economical character of the proposed filler, taken indiscriminately from any place at which the patented composition was to be used, and by the argument that sulphate of copper and mineral asphalt were not shown to be associated in any single patent of the prior art. He lost sight of the wide use in the allied arts of obvious equivalents.

Appellants make the suggestion, commonly urged in patent suits, where the defense of anticipation is interposed, that, if other elements are deemed to be equivalent to those specified in the patent, the way was open to appellees to use such claimed equivalents, and thus avoid conflict. But it is not disclosed in the present case that appellees are voluntarily, and from choice, appropriating the formula of appellants; such a desire is expressly disclaimed. For some reason, not made clear by the record, the city had, in substance, specified the Willite formula for this Pendleton avenue pavement, and had advertised for competitive bids, under which all such contracts for municipal improvements are let. Appellees were compelled either to conform to the specifications or to abandon the field as bidders. Under such circumstances, they elected to challenge appellants' claimed monopoly.

Appellees strongly claim that the pavement, as actually constructed, does not infringe even though the patent be sustained; but, in view of the conclusion reached on the question of validity, it is deemed unnecessary to consider the other points raised by either party to the controversy.

It follows that the decree below should be affirmed; and it is so ordered.