## GIBBS–INMAN CO. v. GEO. D. BARNARD STATIONERY CO.

### No. 9595.

Circuit Court of Appeals, Eighth Circuit.

Feb. 7, 1933.

John H. Bruninga, of St. Louis, Mo., for appellant.

Edward M. Harrington and Howard G. Cook, both of St. Louis, Mo. (Frank B. Coleman, of St. Louis, Mo., on the brief), for appellee.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This was a suit by appellant for infringement of letters patent No. 1,274,032 for a "Railway Pass," issued to James D. Gibbs, July 30, 1918. The nature of the invention covered by this patent is thus set forth in the specification:

"My invention relates to the class of railway transportation known as annual passes, which have heretofore been of the form of separate cards, approximately two and one half by four inches and having rounded corners.

"These passes require to be made out in triplicate, an original or pass proper, and two duplicates for alphabetical and numerical record cards, and the duplicates require additional pass record matter to be printed thereon.

"I have found that it is exceedingly difficult to handle the cards individually in a typewriter and it has been proposed to provide a frame or holder into which the card constituting the pass proper would be inserted and the same assembled with loose record sheets and interposed carbon sheets and placed in the typewriter in the same manner as ordinary sheets of paper.

"Such an arrangement has proved impracticable owing to the time and care required to insert this pass proper into the holder, and the difficulty of securing proper alinement of the superposed sheets.

"The present invention aims to provide a construction and arrangement of assembled

pass and record blanks which may be readily inserted in a typewriting machine without the use of any holder or frame, in which the blanks will be maintained in proper alinement, and in which the matter constituting the pass proper and also the additional record matter may be simultaneously written upon superposed sheets."

The patent contains two claims, both alleged to be infringed:

"1. A railway pass form comprising a plurality of superposed sheets of paper detachably connected together at one extremity, the overlying sheet being of less width than the underlying sheets, said sheets bearing in superposed alinement suitable data and blanks, whereby the detachable overlying sheet constitutes a pass form and the underlying sheets constitute record forms, the extended parts of the record forms bearing record matter and blanks, not embraced in the pass proper and adapted to have simultaneously impressed thereon additional pass record matter.

"2. A railway pass form comprising a plurality of superposed sheets of paper detachably connected together at one extremity, the overlying sheet being of less width than the underlying sheets, each of said sheets being divided by lateral weakened lines into a plurality of transverse separable strips, said strips bearing in superposed alinement suitable data and blanks whereby the separable strips of the overlying sheet constitute pass forms and the separable strips of the underlying sheets constitute record forms, the extended parts of the record forms bearing record matter and blanks, not embraced in the pass proper and adapted to have simultaneously impressed thereon additional pass record matter."

The trial court held that the pass form manufactured and sold by the defendant, appellee here, eliminates two elements called for in the claims of the Gibbs patent, and is therefore not an infringement of those claims; also that, in view of the prior art and disclosures pleaded and offered in evidence at final hearing, patentable invention is so far lacking as to render the Gibbs patent invalid. On both grounds the finding was for the defendant, appellee here.

As said in the specification quoted, an important aim of the patent in suit was to provide a construction and arrangement of the assembled pass and record blanks whereby the blanks would be maintained in proper alignment and whereby "the matter constituting the pass proper and also the addition-

al record matter might be simultaneously written upon superposed sheets." For this purpose binding portions, B, are shown in the drawings. Of these the specification later has this to say:

"The binding portions B may be secured together in any suitable manner which will not interfere with the passage of the assembled blanks through the typewriting machine."

This binding element is recognized in both claims in the following identical language:

"A railway pass form comprising a plurality of superposed sheets of paper detachably connected together at one extremity."

In the patented commercial device this binding element consisted of a staple. Subsequently, it appears this use has been discontinued. Appellee's device does not employ a fastener, and in this particular differs radically from that of appellant. Also, in the claims of the patent in suit, the overlying sheet of those superposed is of less width than the underlying sheets, while, as found by the court, in defendant's pass forms only the bottom sheet of the three separate sheets is wider than the two sheets above it. These departures from the claimed elements of a device, occupying at best a very narrow field of invention, are sufficient, as found, to defeat the charge of infringement. This finding would, standing alone, serve to dispose of the instant case; but the trial court has also found the patent in suit invalid for want of patentable novelty and invention. This finding therefore demands attention from this court.

At the outset we are impressed with the numerous preceding devices and practices that must be presumed to have made important disclosures to this patentee. The subject-matter was treated in the Smith patent, No. 1,198,590, applied for and issued two years before that of Gibbs. The specification states the Smith objective thus:

"The objects of my improvement are: first, to provide a holder and frame for separate passes, franks or other forms which will retain same in a true position while being filled out on an ordinary typewriter or other writing device; second, to afford facilities in one writing operation on a typewriter or other writing device for (a) filling out separate passes, franks or other forms; (b) making manifold counterparts of the matter written on the pass, frank or other form by the use of carbon paper, upon conforming record cards or other forms, and (c)

filling in additional record or other data required to be shown on the record cards or other forms after the writing of the pass, frank or other form is completed; third, to provide a uniform method which common carriers may follow in issuing and writing annual or term passes or franks and making record thereof, under the regulations prescribed by the Interstate Commerce Commission dealing with the subject of uniform methods for the issuing and recording of passes by carriers, effective January 1st, 1912; and fourth, to provide a method by which carbon counterparts of matter written upon blanks or forms of one size used for any purpose, may be transmitted by the use of carbon paper and impressed upon other blanks or forms of a larger size used for any such purpose."

On or about September 1, 1916, the Interstate Commerce Commission issued a booklet containing regulations to govern the forms and recording of railroad passes. Form 11 was in this form:

```
...............  Form......:.  No.....
Name ...................................
Address ................................
Account ................................
Accommodations, etc. ...................
Territory ..............................
Date of expiration .....................
Request of .............................
Date issued ............................
Remarks ................................
```

A footnote relating to this form reads thus:

"In order to facilitate the preparation of such passes and records as are prepared on paper thin enough to secure two legible carbon copies, the records and indexes of passes issued may be made in that manner. In such cases and by preparing record forms sufficiently longer than the pass forms, the information not required on the pass form may be shown at the right of the information which is required, viz: 'Address' on the line with 'Name'; 'Request of' on the line with 'Account'; 'Date issued' on the line with 'Territory'; and 'Remarks' on the line with 'Date of expiration.' "

Appellant's application was filed in the Patent Office July 19, 1917. The crux of this alleged invention upon which especial emphasis is laid, as introducing a valuable commercial departure, is more explicitly disclosed in claim 2, to wit, a plurality of superposed sheets of paper detachably connected together at one extremity; each of said sheets being

divided by lateral weakened lines into a plurality of transverse separable strips. This feature is thus illustrated in the drawings:

In this feature convenience and economy in printing a multitude of passes is particularly claimed. The production of duplicate copies by means of multiple sheets of paper, with carbon paper placed between these sheets for insertion in a typewriting machine, has long been well known. This use is also illustrated in prior art patents, notably that of Donning No. 759,215, "Statement Blank," issued May 3, 1904. It is taught with respect to railway passes specifically by the note relating to Form 11, contained in the regulations of the Interstate Commerce Commission hereinabove quoted; also in the Harvey patent for a "Book Sheet," No. 1,182,171, issued May 9, 1916. The extended sheet, comprising a plurality of members, separated by

a line of perforations, is shown in the Donning patent. We quote from specification and claim 2 as follows:

"It is to be understood that the statement-blank herein shown may be a single sheet of paper unbound or may be one of a number bound in suitable book form. Furthermore, the ruling may, if desirable, be double, and each sheet thus present a double lining, and that it may be arranged in sheets, each sheet constituted of several of the statements, the matter on the sheets being separated, as by perforations. This would enable the device to be utilized for all purposes connected with a mercantile business, such as blanks for receipts, checks, orders, records of shipping consignments, and for many other forms connected with a business-house where a duplicate record is desired with the one writing."

"2. The herein-described loose or unattached statement-blank or billing-form comprising a plurality of members, integral one with the other, folded together, and separated by a line of perforations, one member constituting the original or customer's statement-blank, and another constituting the merchant's filing-blank, the customer's blank being provided on its upper face with requisite appropriately-designated date, items, extension, and credits spaces, one blank being provided with an appropriately-designated space for a department-column and a sales-person-number column, and the filing-blank having one of its edges extending beyond the edge of the customer's blank and provided with means near its said edge for attachment to a book or holder."

The trial court points out that suitable perforations are provided in the Harvey patent which are longitudinal rather than transverse. Superposed sheets for the making of multiple copies with marginal record data, by means of inserted carbon sheets, are and were old in the art and in common experience. Sheets of units detachably connected together have long been familiar in the form of bank checks, tickets, baggage checks, postage stamps, and tags of various kinds. In view of all these teachings and disclosures, the arrangement and changes, obvious to one skilled in the printer's art, and claimed in the patent in suit, scarcely reach the plane of patentable novelty and invention.

Appellant lays great stress upon its claim that the construction and form contemplated by this patent has made a decided impress upon this particular art, as evidenced by the great number of passes thus issued and the amount realized therefrom. It must be re-membered that the extent to which a patented device has gone into use is not always a safe criterion even of its actual utility. However, extensive use is generally strong proof of utility, but not of invention. There must be present a creative mental conception as distinguished from "the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice." American Road-Machine Co. v. Pennock & Sharp Co., 164 U. S. 26, 41, 17 S. Ct. 1, 7, 41 L. Ed. 337; Western Willite Co. v. Trinidad Asphalt Mfg. Co. (C. C. A. 8) 16 F.(2d) 446, 450.

We think the decree of the district court should be in all things affirmed, and it is so ordered.

STONE, Circuit Judge.

I concur in the result reached, basing my concurrence on that part of the opinion determining there is no infringement.