## DE LORE v. ST. LOUIS LITHOPONE CO. et al.

Circuit Court of Appeals, Eighth Circuit.
May 29, 1928.

No. 7947.

1. Patents ⬤328—1,140,354, claims 1–5, for process for production of zinc sulphate, held invalid for failure to properly describe alleged invention (35 USCA § 33).

Patent No. 1,140,354, claims 1–5, for a process for the production of zinc sulphate, *held* invalid for failure to describe alleged invention in such full, clear, and exact terms required by Rev. St. § 4888 (35 USCA § 33; Comp. St. § 9432).

2. Patents ⬤65—Foreign patents, to be anticipatory, must be limited to what is clearly and definitely expressed therein.

Foreign patents, to be anticipatory, must in general be limited to what is clearly and definitely expressed in them in such full, clear, and compact terms as to enable any person skilled in art to practice it, without necessity of making experiments.

3. Patents ⬤22—Reactions and phenomena of chemistry may sometimes dictate rule as to equivalents at variance with rule applied to physical or mechanical equivalents.

Ordinarily, the reactions and phenomena of chemistry may sometimes dictate a rule as to equivalents which is at variance to that rule as applied to mere physical or mechanical equivalents, but it is only when reactions and phenomena of chemistry are latent and undeveloped that such rule has application.

4. Patents ⬤26(1¼, 2)—Combination of old elements producing new result is patentable, though mere aggregation of old elements does not amount to invention.

A combination of old elements, which cooperate to obtain a new and useful result, is patentable; but a mere aggregation of old elements, each performing its known and usual function, without modification due to combination with other elements, does not amount to invention.

5. Patents ⬤328—1,140,354, for process for production of zinc sulphate held not infringed, if valid.

Patent No. 1,140,354, for a process for the production of zinc sulphate, if valid as to some claims therein, *held* not infringed.

6. Patents ⬤328—1,139,427, for inalterable white pigment and process of making same, claims 3, 6, 8, 9, 10, 11, held not infringed.

Patent No. 1,139,427, for inalterable white pigment and process of making same, claims 3, 6, 8, 9, 10, and 11, *held* not infringed.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Davis, Judge.

Suit by Casper P. De Lore against the St. Louis Lithopone Company and another. Decree of dismissal, and plaintiff appeals. Affirmed.

Lawrence C. Kingsland, of St. Louis, Mo. (John D. Rippey, of St. Louis, Mo., on the brief), for appellant.

Howard G. Cook, of St. Louis, Mo., for appellees.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and JOHN B. SANBORN, District Judge.

VAN VALKENBURGH, Circuit Judge. Appellant is the owner of the two patents in suit. No. 1,140,354, a process patent for the production of zinc sulphate, issued May 25, 1915; the second, No. 1,139,427, for inalterable white pigment and process of making same, issued May 11, 1915. The original patentee was Ramon Bonastre Llopart, a citizen of Argentina. Appellee John P. Thomy was the president and managing officer of the corporate appellee. The plant of appellee St. Louis Lithopone Company was purchased by the Chemical & Pigment Company of Maryland during the summer of 1926. The latter company is now operating the plant.

Upon the issuance of the patents in suit, the patentee assigned them to the Mineral Refining & Chemical Corporation, organized under the laws of Delaware. This company manufactured lithopone for a number of years. In November, 1920, appellant and appellee Thomy took over the operation of

the plant under agreement with the Mineral Refining & Chemical Corporation. Thomy left the company in July, 1921, and became an officer of the Collinsville Zinc Company, the name of which was changed to St. Louis Lithopone Company. The Mineral Refining & Chemical Corporation went into bankruptcy in February, 1923, and thereafter appellant acquired the patents and all of the physical properties of the bankrupt, including the plant and its equipment. Appellant is now operating that plant, making ground barytes and whiting. It appears that the manufacture of lithopone under the patents has been discontinued. The consideration paid for the patents was $29,000. They had been carried on the books of the Mineral Refining & Chemical Corporation at a value of $1,500,000. Negotiations for sale at approximately the purchase price to appellant have borne no fruit.

The appellee corporation and its successor have engaged in the manufacture of lithopone, and have employed the process used in practical operation by the Mineral Refining & Chemical Corporation, with some changes, to which reference will hereinafter be made. May 12, 1925, counsel for appellant served upon the St. Louis Lithopone Company a notice directing its attention to the patents in suit, for the purpose of affording opportunity to desist from the use of processes involving the inventions of the patents. The St. Louis Lithopone Company replied, substantially denying infringement. This suit was filed in the District Court for the Eastern District of Missouri June 13, 1925; the bill prayed injunction and accounting. In their answer appellees attack the validity of the patents upon the ground that, in view of the prior art, the alleged inventions and improvements described in the patents in suit do not constitute patentable subject-matter, and on the further ground that said patents do not describe the alleged inventions purporting to be covered thereby in such full, clear, or exact terms as to enable one skilled in the art to make or employ the same. The infringement charged is likewise denied.

The original application covered the subject-matter of both patents and the specifications remain substantially identical. The Patent Office ruled that two distinct inventions were involved and required division. Patent No. 1,140,354 was therefore granted upon a division of the application upon which patent No. 1,139,427 was issued. The former is referred to in the briefs as patent A, and the latter as patent B. These designations, for convenience, will be preserved. Patent A contains 5 claims, all of which are charged to be infringed. Patent B has 12 claims; those in issue are Nos. 3, 6, 8, 9, 10, and 11. Upon final hearing the court decreed that the bill of complaint be dismissed for want of novelty and lack of invention in the two patents in suit. These patents will be considered in their order. The object to be attained by patent A is thus well stated in the brief of appellant:

"The patents in suit relate to an industrial process for the manufacture of lithopone. For many years the product lithopone has been known to the industrial arts. It consists of an equimolecular precipitate of zinc sulphide and barium sulphate, which precipitate is obtained by combining solutions of zinc sulphate and barium sulphide. This product is one that has been used in connection with the manufacture of rubber goods, celluloid, waxed cloth, and as a filler for linoleum and for other general technical purposes, and in this use it was not important that the ultimate product should be an inalterable white product; but it could be used, even though off color, and even though there was a tendency of the product to change in color. However, it later came into use as a pigment for paints, and in place of zinc oxide or white lead. When used as a paint pigment, it was important that the ultimate product should be pure white in color, and that it should not alter in color when mixed with oil or other paint ingredients. * * *

"The problem, therefore, involved the provision of a substantially pure zinc sulphate solution, which would be relieved of these impurities, namely, iron and manganese, and which would not, due to the treatment for the removal of these impurities, also have introduced into the solution a substance which would interfere with the subsequent steps of the process. Patent No. 1,140,354 deals with this phase of the general industrial process, and relates to the production of the pure zinc sulphate solution."

In the specification it is stated that the industrial product, obtained as a precipitate by combining water solutions of zinc sulphate and barium sulphid, when employed for painting, particularly when mixed with other elements essential for that purpose, is subject to darkening change of color, caused by the presence of other metals such as manganese, bismuth, cobalt, iron, copper, antimony, nickel, and the like, with the result that the paint falls off sooner or later after having been applied, especially on places exposed to sunlight or less powerful light, and on places

26 F.(2d)—55

subject to varying atmospheric conditions. The specification then continues:

"The object of the present invention is to overcome these disadvantages and to provide a stable white product absolutely inalterable under the influence of light and atmospheric and other conditions, and while keeping all of these properties is adapted to be mixed with any color pigment, varnish, or raw or boiled oil of the kind usually used for painting. This inalterable white product consists of equimolecular precipitates of zinc sulphid and barium sulphate subsequently treated as herein described and precipitated by the reaction upon each other of zinc sulphate and barium sulphid, as will be explained.

"Further objects are to provide a simple and efficient process comprising novel steps for manufacturing this process. The new process is in substance as follows: Zinc blende, or zinc blende and other substances, is roasted in such a manner that zinc sulphate and other substances are produced. This mixture is agitated in water preferably hot, and the resulting water solution of zinc sulphate is decanted and then submitted to the action of oxygen from the air and dioxids under the influence of heat. This is accomplished by mixing the zinc sulphate solution with dioxid (e. g., barium dioxid or lead dioxid) and water heated by steam to about 100 degrees C., at the same time passing bubbles of air therethrough. The resultant is a pure stable sulphate of zinc in water solution, which is then passed through a filter press to free it of foreign matter."

The actual process employed by the Mineral Refining & Chemical Corporation and by appellant, in the production of the zinc sulphate of requisite purity, is thus described by the witness McHan, a chemist in charge of production both there and with the St. Louis Lithopone Company until June, 1924:

"In the manufacture of zinc sulphate, impure zinc oxide was dissolved directly in sulphuric acid of about such strength to give approximately a 40 degree Baume solution. This was dissolved to practically the point of neutrality. The resultant impure zinc sulphate solution was then drawn off, was carried through a purification process, which involved three steps or stages, the first step of which was the removal of iron compounds, in the iron group. This was accomplished by heating the solution to about 100 degrees centigrade, and adding barium peroxide, in the presence of the small amount of suspended zinc oxide, and at the same time conducting air through this solution. This resulted in the throwing down of the iron compounds

present, as the ferric hydroxide. After the reaction had gone to completion, and chemical tests showed the solution to be free of iron compounds, it was put through a filter press, where all suspended impurities were removed. It was then passed to the second stage of purification, where the manganese was removed; the liquor again being heated to approximately 100 degrees centigrade, and lead peroxide, in the form of red lead, was added to the point where the manganese was completely precipitated. When chemical tests showed the liquor to be manganese free, it was again pumped through the filter press and carried to the third stage of purification, which consisted essentially in adding zinc dust to the solution and agitating with air and boiling for the removal of cadmium and copper. When chemical tests showed the liquor to be cadmium and copper free at this point, it was again pumped through the filter press to remove suspended impurities, and from there to the pure liquor storage tank."

It will thus be seen that in the removal from the zinc solution of the objectionable darkening impurities, particularly iron and manganese, two dioxids, barium peroxide and lead peroxide, were used in the order named. A third stage of purification was also necessary for the removal of cadmium and copper. It is conceded by appellant that barium peroxide will remove the iron, but not the manganese; that the lead peroxide will remove the manganese, but not all the iron. It is therefore necessary to use these dioxids in combination, and, it would appear, in succession. Appellant claims that this specific process is taught by the patent to one skilled in chemistry and in the art. It is the contention of appellees, as stated in their answer, that the process as stated is not described in such full, clear, or exact terms as to enable one so skilled to make or employ the same.

This contention, which is a crucial one in the determination of this controversy, requires reference to prior patents in the same art in order that it may be determined what, if anything new, was revealed by the specification and claims of patent A. Austrian patent No. 18,034, issued and published in June and October, 1904, was for a process for the manufacture of fast to light and weather-proof lithopone. The general process of producing the product known as lithopone by combining water solutions of zinc sulphate and barium sulphide is shown. It is also pointed out that the impurities, such as manganese, iron, cobalt, nickel, etc., are necessarily removed by oxidizing agents,

among the number manganates and superoxides generally.

The German patent No. 154,085, issued to Dr. Lorenz Lucas, and published in September, 1904, was for a process for the purification of zinc liquors from iron and manganese compounds. It says: "Then it was found that for the precipitation of both metals lead superoxide was very well suited, and indeed the purification proceeds very smoothly if the neutral zinc solution is treated with some lead superoxide (peroxide). Also the presence of zinc oxide is helpful in this case, or of zinc oxide hydrate precipitated by alkalies or by alkaline earths."

Ramen's patent No. 9,064, issued in 1914, was for a method of precipitating iron from solutions containing zinc and iron. He combined a treatment with air with the addition of alkaline earth carbonate as a precipitant.

Hunt, in 1913, employed peroxide of lead for the same purpose. Thwaites, in 1908, used various oxidizing agents to precipitate iron and manganese in his process for the manufacture of zinc sulphide. Lihme, in 1908, in a patent for nondarkening lithopone and process of making the same, after purification seeks to prevent reaction among the impurities by adding thereto in succeeding stages a soluble nitrate. Alberti, in 1907, in his process for the preparation of lithopones for the purpose of preventing the product from turning black in sunlight produces oxidation by the addition of superoxids of alkali and alkaline earths as well as superoxid of hydrogen. Among the reagents he mentions is superoxid of barium.

It will thus be seen that the process of manufacturing lithopone was well known to the prior art, and that various patents existed for the production of a white lithopone which should be proof against darkening through exposure to sunlight and atmospheric conditions. All these patents taught the necessity of oxidation, which is defined as embracing any changes in an element or a compound that result in an addition to it of a negative radical, or relative decrease of the positive constituent. To accomplish this a large number of reagents were employed; that is to say, substances used for making clear the condition of what was under observation by mutual chemical reaction. In other words, it was necessary that the objectionable elements, such as iron and manganese, should be thus precipitated and removed. We have seen that among these reagents are manganates, which are salts of manganic acid, among which barium is found; also hydroxides, permanganates, peroxides,

and superoxides, notably of lead and barium. In the patent in suit the term "dioxide" is used, which means that it contains two atoms of oxygen to the molecule. It is conceded by witnesses for appellant that superoxides and peroxides are dioxides. Therefore, in the prior art it was well known by what chemical combinations lithopone was produced; that in order to produce a stable white article oxidation and precipitation by reagents was necessary in order to remove the darkening effect of impurities such as manganese and iron. The use of dioxids had been taught for this purpose. The use of heat and injections of steam as contributors to this result in the manufacture of zinc sulphate was common. The claims in patent A are the following:

"1. A step in the herein described process of preparing an inalterable white product, said step consisting in treating a water solution of zinc sulphate with bioxids, air bubbles, and injections of steam.

"2. A step in the herein described process of preparing an inalterable white product, said step consisting in treating a water solution of zinc sulphate with an oxidizing agent and air bubbles.

"3. A step in the herein described process of preparing an inalterable white product, said step consisting in treating a water solution of zinc sulphate with an oxidizing agent, air bubbles, and steam.

"4. A step in the herein described process of preparing an inalterable white product, said step consisting in treating a water solution of zinc sulphate with an oxidizing agent, air bubbles, and heat.

"5. A step in the herein described process of preparing an inalterable white product, said step consisting in treating a water solution of zinc sulphate with an oxidizing agent and heat."

It will be seen that these claims, standing alone, add nothing to what was already known in this specific art. But appellant claims that the combined use of barium dioxide and lead dioxide was not theretofore known, taught, and practiced, and appeals to the specification as conditioning the scope of the claims in this particular. That specification, however, fails to support this interpretaton. It says: "This is accomplished by mixing the zinc sulphate solution with dioxid (e. g., barium dioxid or lead dioxid)." The disjunctive is used. The specification is satisfied by the use of any dioxid of the nature indicated; that is to say, either barium dioxid or lead dioxid, as the operator may choose. There is no statement that either alone would be insufficient, and certainly no teaching of

the successive use of both dioxids, as employed by appellant, and charged against appellees, in the manufacture of the commercial product. That the appellee had not in mind the combined use of two dioxids is further evidenced by the language of the claims. In claim 1 the term "bioxids" is used, but evidently \ in the general sense indicated in the specification. In the remaining four claims the term "an oxidizing agent" is used. In view of the claim now urged by appellant, the use of the singular is significant. This interpretation is made still clearer by the testimony. The witness McHan, for appellant, thus testifies:

"Q. You spoke of peroxide of barium. Is that the same exactly, chemically, as the dioxide? A. The peroxide of barium would be included in the general class of dioxides, yes. Dioxide is the generic term, and includes them all.

"Q. Would have the same effect? A. All dioxides have the same effect. * * *

"Q. And, of course, a lead peroxide would be a lead dioxide; is that correct? A. That is correct; yes, sir.

"Q. Be the same thing? A. That is correct; yes.

"Q. What is the purpose of the addition of the dioxide—that is, barium dioxide and lead dioxide—in respect of acting as an oxidizing agent? A. Well, they are oxidizing agents, and that is the purpose of their being added; to precipitate the iron compounds and also the manganese compounds as oxides. It is, of course, necessary to add some oxidizing agent, in solution, to so precipitate them.

"Q. Well, what have you to say as to the necessity of the use of the barium dioxide and lead dioxide to get rid of the iron and the manganese in the zinc liquor? A. We found it—my experience—I found it essential to use it—both of them."

Under section 4888, R. S. (35 USCA § 33; Comp. St. § 9432), the specification must describe the invention and the manner and process of "making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, * * * to make, construct, compound, and use the same."

In Béné v. Jeantet, 129 U. S. 683, 686, 9 S. Ct. 428, 429 (32 L. Ed. 803), the court points out that the specification must be·so full and clear as to give one skilled in chemistry "such an idea of the particular kinds and character of the chemicals, or combinations of chemicals, with the relative proportions of each, as would enable him to use the invention without having to resort to experiments of his own to discover those ingredients."

It is evident that McHan, as he says, had discovered merely by experience that the use of both dioxids, instead of one, was necessary. to get the desired result. Again, the witness Wiedemann, appellant's expert, testified as follows:

"Q. You have testified that you found in at least two of these patents the use of lead peroxide, in order to precipitate the iron? A. Yes, sir.

"Q. Now, is lead peroxide a dioxide? A. It is a dioxide, or it is a peroxide.

"Q. So, when the patent in suit, in line 76, there is lead dioxide, you would understand that, if a person used lead peroxide, they would be following what the patent called for, would you? A. Oh, yes.

"Q. And you see in lines 75 and 76, in parenthesis— A. Yes, sir.

"Q. Barium dioxide or lead dioxide? A. Yes, sir.

"Q. End of the parenthesis. So that you would understand he did not use both barium dioxide and lead dioxide, but that he used alternately either one or the other; is that correct? A. That would be the interpretation of that particular paragraph."

[1-3] It may be conceded that, if the patent had described the manner and process of producing the pure zinc sulphid by the use of both barium dioxide and lead dioxide, substantially in the manner employed by appellant and appellees in the manufacture of the commercial product, it would have disclosed patentable novelty and invention as compared with the prior art; but we cannot think it did so in the full, clear, concise, and exact terms required by section 4888 of the Revised Statutes. We are aware of the rule that foreign patents, to be anticipatory, must, in general, be limited to what is clearly and definitely expressed in them in such full, clear and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments. Carson v. American Smelting & Refining Co. (C. C. A.) 4 F.(2d) 463. Also that ordinarily the reactions and phenomena of chemistry may sometimes dictate a rule as to equivalents, which is at variance to that rule as applied to mere physical or mechanical equivalents; but it is only when the reactions and phenomena of chemistry are latent and undeveloped that this rule has application. Western Willite Co. v. Trinidad Asphalt Mfg. Co. (C. C. A. 8), 16 F.(2d) 446, 450.

[4] A combination of old elements which co-

operate to produce a new and useful result is patentable, but a mere aggregation of old elements, each performing its known and usual function, without modification due to its combination with other elements, does not amount to invention. To illustrate: In this case the use of a dioxide to precipitate iron and manganese from a zinc sulphate liquor was not new in this specific art. Lead dioxide or peroxide had been disclosed and used for this very purpose. Barium peroxide had been specified to prevent darkening from reaction. It is true that the latter had not been prescribed at the stage of the process as practiced in the production of the commercial product by either appellant or appellees; but it appears from the testimony that the desired result can be attained only by the combined use of lead dioxide and barium dioxide, and this combined use is neither taught nor suggested by the specification or claims. If the patent had suggested such combined use, undoubtedly a process, differing from any theretofore used, would have been disclosed; but it is clear that the use of any one dioxide alone, whether lead or barium, would have added nothing to what was already known in the art. It required experiment to develop the feature now claimed for the patent; a feature that the language of the patent does not suggest. It is true that appellant's experts testify that the patent calls for the use of both reagents, but this statement of a conclusion cannot stand, in the face of the unambiguous language employed and the admissions contained in their testimony.

It is further urged that the use of air bubbles adds a novel element to the process; but the employment of air as an oxidizing agent was old, and runs through the disclosures of the prior art. So, also, as to injections of steam and the presence of heat. All patents and all processes employ heat in connection with the oxidation of iron and other impurities.

Mr. Kenyon, in his patent No. 4,334, issued in 1887, says: "For this purpose I provide any suitable arrangement whereby a stream of air (superheated or otherwise) either by itself or mixed with steam is blown into the solution aforesaid, preferably through perforated pipes, either under the ordinary pressure or under increased pressure in closed boilers."

Counsel for appellant in their brief lay little emphasis upon the use of air bubbles because that use had been discontinued by appellees long prior to the notification and filing of suit in this case; instead, steam alone is injected, largely, as it is stated, for affording a more direct application of heat. Counsel, therefore, lay especial stress upon claim 5, which reads as follows: "A step in the herein described process of preparing an inalterable white product, said step consisting in treating a water solution of zinc sulphate with an oxidizing agent and heat."

[5] But the treating of a water solution of zinc sulphate with an oxidizing agent and heat was very old in this art. We conclude that patent A is void for failure to describe the alleged invention purporting to be covered thereby in such full, clear and exact terms as to enable one skilled in the art, without experimentation, to make and employ the same; and, even if valid as to some claims, it is not infringed because of the omission of a material element.

Turning now to patent B, which is for an inalterable white pigment and process of making same, it is unnecessary to repeat what has been said concerning that part of the process already considered. Claims 3, 10, and 11 have to do with steps of calcining the product at temperatures not less than 500 degrees centigrade and not greater than 700 degrees centigrade. 500 degrees centigrade equals 930 degrees Fahrenheit. 700 degrees centigrade equals 1,292 degrees Fahrenheit. The experiments conducted on behalf of appellant, whereby the temperatures at which appellees calcined their product are sought to be established, are unsatisfactory. The degree of heat used is claimed to be established by the tints of the experimental slabs manufactured, as compared with appellant's product; but we are convinced, from a reading of the testimony, that the color of the product is a very uncertain index of the degree of heat used. The color attained depends largely, if not entirely, upon the precipitating reagents employed. Furthermore, the methods employed by appellant and his predecessors for ascertaining the temperature of the precipitate while in process are confessedly unreliable. Methods and instruments used by appellees were more exact. It is shown by the testimony that the temperatures employed by the latter ordinarily ran from 1,300 degrees Fahrenheit to as high as 1,680 Fahrenheit.

Conceding, without deciding, that this patent discloses a novel and patentable range of temperatures, we do not think infringement in this respect on the part of appellees is established. The contention of appellant is that a temperature below 500 degrees centi-

grade results in a lack of covering power in the pigment, and that one above 700 degrees causes cindering, burning or scorching, producing hard particles difficult of removal and impairing the quality for use in paint. It appears, however, that the ill effects of undercooking or overcooking was well known and appreciated, and the efforts of manufacture on the part of appellees were directed merely to the avoidance of such ill effects. Ranges of temperature varied with the conditions found to exist.

[6] Claims 6, 8, and 9 have to do more particularly with cooling and washing the calcined product and in drying the cooled and washed product at a temperature between 80 degrees and 100 degrees centigrade. It appears from the testimony that the temperature used by appellees at this stage of the process uniformly exceeded 100 degrees centigrade or 212 degrees Fahrenheit, and that modern practice now dries up to a temperature of 120 degrees centigrade and at 250 degrees Fahrenheit. Ranges of temperatures and vices of under or over cooking were well known and were and are determined largely by the experience of the operator, the instrumentalities employed, and the length of time the pigment is subjected to the action of heat. Without passing upon the validity of this patent as to the range of temperatures prescribed, we do not find that infringement is established.

Our conclusion is that the action of the trial court in dismissing the bill was right and should be affirmed.

It is so ordered.