## SCHERING CORPORATION v. GILBERT et al. (UNITED STATES, Intervener).

No. 156.

Circuit Court of Appeals, Second Circuit.

Jan. 18, 1946.

FRANK, Circuit Judge, dissenting in part.

———————◆———————

Briesen & Schrenk, of New York City (Newton A. Burgess and Fred A. Klein, both of New York City, and Harold T. Stowell, of Washington, D. C., of counsel), for plaintiff-appellee.

A. J. Nydick, of New York City, for defendants-appellants.

John F. X. McGohey, U. S. Atty., of New York City (William L. Lynch, Asst. U. S. Atty., of New York City, C. E. Rhetts, Acting Head, War Division, Harry LeRoy Jones, Chief, Alien Property Litigation Unit and M. S. Isenbergh and David Schwartz, Chief Trial Attys., Alien Property Litigation Unit, War Division, all of Washington, D. C., of counsel), for intervener-appellee.

Before SWAN, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The appellee is a New Jersey corporation and the owner of U. S. Patent No. 2,345,384 which was granted to it on March 28, 1944 as the assignee of the inventors whose application was filed on April 6, 1940. It sued the appellants, Jules R. Gilbert and William Bell, partners in business under the firm name of National Synthetics, in the District Court for the Southern District of New York for infringement of the patent, relying at the trial only on Claim 2. Before trial a motion to dismiss the complaint was overruled and after trial an interlocutory decree for damages to be determined upon a reference for the infringement of Claim 2 and for an injunction was entered for the plaintiff, and the defendants' counterclaim was dismissed. This appeal is from that decree.

As stated in the specifications, the invention relates to "poly iodized derivatives of the hydroxy diphenyl carboxylic acids and a process for preparing the same," but the patent contains only product claims. Claim 2 is a short claim for one definite chemical compound not found in nature and never previously synthesized. It is for the beta-(4-hydroxy-3,5-diiodophenyl)-alpha-phenyl propionic acid which melts at 159°C. The claim is in phraseology readily understood by those conversant with such terminology and is a precise and adequate claim for the product it describes. The defendants have conceded infringement if the claim is valid. Its validity, however, has been vigorously contested as has that of claim 4 which is a broad, generic claim for a group of compounds of which that of Claim 2 is one specific example.

It was shown that compliance with the instructions in Example 4 in the specifications by a skilled organic chemist produced the identical product of Claim 2. To be sure it was not a difficult procedure when the way had been blazed but the ease of accomplishment by one who follows the teachings of a patent is added evidence of the adequacy of the disclosure.

The inventors were trying to improve the art of cholecystography and were using known principles of organic chemistry as their tools. The problem was not the mere

construction of a chemical formula followed by experiments to see if what had been formulated could be synthesized. They had so to contrive that a stable compound would be produced with ingredients which would after oral administration so act upon the gall bladder, without much, if any, distressing effect upon the person whose gall bladder was being so treated, that sufficiently revealing X-ray pictures of it could be taken. Those ingredients had to have properties which would provide a dye to give opacity and be so bound to a carrier that the gall bladder would, in the exercise of the natural functions of the organs in the body of the patient, be filled with it, and that to the exclusion of unwanted deposits elsewhere. Consequently the carrier had to have such an affinity for the bile that it would be attracted to the gall bladder. Furthermore, in addition to having the proper coloring matter and being sufficiently lipoid soluble, the compound had to be practically free from toxic effect when properly administered by comparatively small oral dosage. To any suggestion that that was a simple problem whose solution should have been obvious to the skillful the sufficient answer seems to be that it eluded all in that class for many long years while persons with diseased gall bladders waited in vain for relief from the harmful effects of distressing methods of diagnosis.

The appellants rely principally on the two-fold and rather technical contention that Claim 2 is invalid as lacking invention because (1) it is a claim for a product which is nothing but a molecule that has resulted from inevitable chemical reactions governed by the laws of nature, and because (2) there was no novelty in the process used to produce the result.

In order to determine whether such a defense is factually correct as to Claim 2 and legally sound, it is necessary to understand what the inventors did as well as what they sought to accomplish and give recognition to their end result as a novel and useful improvement, not in the art of organic chemistry but in that of cholecystography.

They were two Germans, Max Dohrn and Paul Diedrich, who were skillful scientists both in the field of organic chemistry and in that of contrast media needed for use in taking X-ray pictures of certain organs in the human body. They were employed by Schering A. G. of Berlin, Germany. In the compound of Claim 2, they succeeded in combining all three of the characteristics desired in a contrast agent for use in cholecystography, obtaining the required solubility from the carboxyl component, affinity for the bile from the phenyl component, opacity from the iodine component, and, most important of all, a very high degree of compatibility in almost every instance.

The specifications state that:

"Not only the known tetra iodo phenolphthalein but also iodized derivatives of 2-phenyl cinchonic acid (see U. S. Patent No. 1,846,321) have been employed for rendering visible the gall bladder by X-rays. All these compounds yield a good picture but they are not sufficiently indifferent physiologically on application in the necessary rather large amounts.

Now, the poly iodized derivatives of the hydroxy diphenyl carboxylic acids represent lipoid-soluble compounds, which, contrary to the hitherto known contrast agents for the gall bladder combine a very good contrasting effect with an excellent compatibility. Said derivatives are made by iodizing o- or p- hydroxy diphenyl carboxylic acids by methods known per se."

The specifications go on to say that the inventors have found the most suitable contrast agents to be the iodized compounds of hydroxy diphenyl carboxylic acids of a general formula, which is set forth and followed by explanatory language to the effect that it covers all members of the acetic acid radical group and radicals of homologues of acetic acid combined with specified members of the hydroxyl group and the whole iodized. As general examples of what is meant there are given "hydroxy diiodo diphenyl acetic acid, hydroxy —or dihydroxy diiodo diphenyl propionic or—butric acids and others," and it is said that 3,5-diiodo-4 hydroxy diphenyl acetic acid and beta-(4-hydroxy-3,5-diiodo phenyl)-alpha-phenyl propionic acid are especially suitable. After saying that the salts of these acids are soluble in water with neutral reaction, the inventors give eight specific examples of ways to practice the invention and add that, "Of course, many changes and variations may be made in the reaction conditions, the solvents used, the reagents employed and the like" and make some suggestions in that regard. Then they say: "For using the compounds described and claimed as X-ray contrast agents for rendering visible the gall bladder, they are preferably employed in the

form of chocolate-covered granules. 3 grs. of these are usually sufficient in order to give excellent X-ray pictures of the gall bladder 12-14 hours after application. Of course, the contrast agents may also be administered in another form, for example, in the form of tablets or the like. Furthermore salt solutions of the acids may be used likewise." After warning that all changes and variations made by those skilled in the art "must comply with the requirements of the principles set forth herein and in the claims annexed hereto," it is explained that, "By the expression 'trivalent hydrocarbon residue of an acid of the acetic acid series' as employed in the claims is to be understood the radical of the acid minus the -COOH group; such residue being trivalent by reason of the fact that it is joined to the two phenyl radicals as well as to the -COOH group." This last explanation, however, has to do only with Claim 4 in which alone the quoted expression is used. Four claims were allowed but numbers 1 and 3 are neither shown to have been infringed nor are they relied on by the plaintiffs or attacked by the defendants now.

■ The foregoing is a fair summary of the contribution to the art which these inventors made in their specifications as the needed consideration for the grant of the claims which were allowed and the question of invention must be resolved in the light of what the situation was when they made that contribution.

Previously the most notable advance in the art of cholecystography had followed the discovery in 1923 or 1924 by Drs. Graham and Cole that good X-ray visualization of the gall bladder could be obtained by the administration of purified tetraiodophenolphthalein or its related compounds. The least painful method of administration was oral, but that, often if not always, required double dosage and sometimes had to be followed by intravenous injection. The after effect on the patient was usually toxic reaction causing much distress from nausea, vomiting, dizziness, diarrhea, headaches and the like; and, when intravenous injections were necessary, they not only were somewhat painful but had to be made slowly under the immediate supervision of a doctor or skilled attendant and there was always present the added danger from probable chills, possible infection, harm to local tissues, and the formation of blood clots in the circulatory system. Moreover, in the colon close to the region of the gall bladder an appreciable amount of the coloring matter in the contrast agent would lodge and might cause, despite skillful use of the X-ray machine, added shadows on the radiograph which made the picture of the gall bladder more confused and difficult to interpret.

■ Though a contrast agent which was much better physiologically and perhaps somewhat better otherwise was much needed, no one succeeded in producing one until some nineteen years later when these inventors did so. With astonishing rapidity after the product of Claim 2 of the patent in suit became available to the medical profession under the trade-name of Priodax it, according to the uncontradicted testimony in this record, practically supplanted the older preparations. Both of the specialists in radiology who testified, one called by the plaintiff and one by the defendants, used it exclusively. And the defendants, who were in the business of making and purveying such contrast agents, soon copied Priodax and marketed an identical product under the trade-mark Dikol. The trial judge's finding of utility was overwhelmingly supported by the evidence.

■ Nor was it by any means obvious that the product of Claim 2 would have the needed characteristics for an improved contrast agent for use in gall bladder radiology though now that the solution of the problem has been found in the end product of a fairly simple series of chemical reactions it is easy unjustly to belittle what was done unless proper consideration is given to the following potent evidence of the fact that inspiration beyond the ordinary was needed. The product was an entirely new composition of matter; it was recognized almost at once as a much desired solution of what had been up to then a problem which had baffled others for many years; and it drove its most notable predecessor which had for nineteen years been the best contrast agent used in cholecystography from that field with surprising rapidity. Such indicia of invention may not always be absolutely reliable, it is true, but they are the best guides to decision in cases of this kind. Their use for that purpose has the sanction of long judicial approval. Du Pont & Co. v. Glidden Co., 2 Cir., 67 F.2d 392, 395, and cases there cited. The utter novelty of this product makes the seemingly slight departure from the old deceptive unless it

is kept in mind that such things must be evaluated not alone by the degree of the change but also by reference to the purpose sought to be accomplished. Traitel Marble Co. v. Hungerford Brass & C. Co., 2 Cir., 18 F.2d 66. Invention is a fact to be proved; and where novelty, utility, commercial success, imitation by those skilled in the art, and the practical satisfaction of a need long before recognized but unfulfilled are shown as in this record, the finding that the product of Claim 2 was the result of inventive thought is amply supported by substantial evidence. Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277. See also McCurrach, et al. v. Cheney Bros., 2 Cir., 152 F.2d 365.

Claim 2 is to be read on the specifications and not as nothing but a chemical formula apart from its setting. R. M. Hollingshead Co. v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543; Western States Mach. Co. v. Hepworth Co., 2 Cir., 147 F.2d 345. Nevertheless, though the patent in so far as Claim 2 is concerned seems to measure up to the standards by which invention and validity are ordinarily to be determined, the defendants attack it in another ingenious and interesting way, yet in one which is, we think, demonstrably unsound.

They say that this new and useful composition of matter is not patentable because Claim 2 covers a new molecule and that a molecule is the inevitable result of the action of so-called laws of nature which are immutable by man and remain free for the use of all unrestricted by patent law. If this were wholly true the corollary would be that the process by which a result is reached, involving as it does the application of natural laws, would be likewise unpatentable and that there could be no valid patents for new compositions of matter. Similarly, there could be no valid patents for new machines or for new methods for making them since so-called natural laws of physics, such as those relating to gravity and friction, to mention only two, always play their part. Obviously, such an advanced position cannot be maintained in the face of the patent statute and the multitude of authoritative decisions to the contrary.

Yet there is a certain amount of plausibility in the argument and its interest lies in the fact that it is in effect the antithesis of the usual attack on patents based on the simplicity of the change from old to new. Now the deepseated, fundamental character of the change is relied on to exclude credit to human ingenuity and give it all to natural forces, regardless of what it took on the part of the inventors to control and direct those natural forces. We cannot believe that this negatives invention though we agree that the so-called laws of nature cannot be patented per se.

Factually the basis of the defendants' argument is largely correct. Claim 2 does describe what in chemical parlance is a molecule though it is equally correct to call it a compound; but, however labelled, it is none the less a new composition of matter.

■ The reactions which take place when the teaching of Example 4 in the specifications is followed to produce the compound described in Claim 2 do create atomic change in kind and position within the molecules. The particular atomic structure of the new molecules is presumably what gives the compound the attributes which make it so uniquely acceptable as the happy ending of the long search for a contrast agent with the desirable compatibility for use in gall bladder examination. That new structure is the result of reactions which follow natural laws and when one is told that will set the so-called natural laws into operation to the proper extent the rest is easy. But as will be seen in the discussion of Claim 4 the opportunities for changes in the atomic structure of the molecule within what is chemically represented by the so-called benzene ring are theoretically to be numbered in the millions and are practically legion. Had the new composition been only the result of blending or mixing old compounds to obtain a new and useful one without molecular change no one would, we think, dispute invention, otherwise shown, merely because the application of natural laws was involved. Nor does it seem that the rearrangement of the atoms within a molecule as the result of the application of natural law differs except in the manner or degree of change. The usual indicia of invention being shown the proof establishes the fact as much when molecular change is involved as when it is not. A case directly in point is Maurer v. Dickerson, 3 Cir., 113 F. 870, and there seems to be no decision to the contrary. See also, Application of Jones, Cust. & Pat. App., 149 F.2d 501. We think a precise claim for a new and useful compound which has been adequately disclosed in the specifications is no less valid because the compound happens to be a new mole-

cule. And we agree with the trial Judge that Claim 2 is valid and infringed.

But the situation in respect to Claim 4 which the trial judge did not feel called upon to consider requires a different conclusion. There was an actual controversy in respect to that claim despite the failure of the plaintiff to rely upon it at the trial. The plaintiff not only had threatened the defendants with the patent as a whole but the accused compound which was conceded to be an infringement of Claim 2 was but one of the multitude of compounds embraced within Claim 4, and, if that claim is valid, infringed that as well. The validity of Claim 4 was put directly in issue by the defendants' counterclaim and no immunity could be given it by the plaintiff's subsequent disclaimer of reliance upon it. Moreover, the public interest involved in a patent suit requires that, where infringement has been shown if claims are valid, the validity of all claims thus in issue should be decided. Bresnick v. United States Vitamin Corp., 2 Cir., 139 F.2d 239; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632; Mercoid Corp. v. Mid-Continent Investment Co., 320 U. S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

It was shown in evidence and by way of admissions elicited by the defendants from the plaintiff before trial that one skilled in the art of organic chemistry may start in the group of the acetic acid radical and the radicals of homologues of acetic acid to which the patent relates, for instance, with the simple hydrocarbon called methane and theoretically progress along the series in the general group called alkanes from one substance to another by increasing the size of the molecules in steps of one carbon atom and two hydrogen atoms. At least formulas for such substances, as well as for others, can be written in an indefinite chain. Also it was shown that for the hydrogen atoms of the alkane molecules the atoms of what are called halogens may be substituted and so may the atoms of other groups including the residue of the hydrocarbon benzene. The latter is represented in chemical formulas by a hexagon which is called the benzene ring and, as changes in the atomic structure of the molecule occur, the ones introduced take varying positions within the ring which positions determine the nature of the compound. Theoretically a multitude of substances not as yet found in nature and not as yet compounded could be synthesized, if skilled organic chemists were given the time and materials with which to work, and actually the formulas for them could be written. There is, however, a practical limit upon synthesis, though the extent of that is not fully known, for some of the new theoretical compounds might be impossible to create, and some would be so unstable that they would disintegrate either at once or in short periods of varying length. Moreover, while analogy is at times useful, organic chemistry is essentially an experimental science and results are often uncertain, unpredictable and unexpected.

Claim 4 covers by means of a broad elastic chemical formula which allows for the greatest number theoretically possible for molecular changes within the benzene ring, not only the compounds illustrated by way of examples in the specifications but also every possible variation of them which might result from further experiment. The specifications do not support that sort of claim but are no more at best than suggestions for experiment. Such experiment might be practically endless and futile as a matter of fact. And it might yield surprisingly useful results which, if this claim were valid, would be futile as a matter of law during the life of the patent. The claim is for an enormous number of as yet non-existent compounds and is far broader than any disclosure in the patent. The specifications afford no adequate consideration for its grant and it must be held invalid for that reason. The Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221; Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Libbey-Owens Glass Co. v. Celanese Corp., 6 Cir., 135 F.2d 138; Metals Recovery Co. v. Anaconda Copper Min. Co., 9 Cir., 31 F.2d 100.

Perhaps, as the appellants have argued, this claim is so far fetched that the entire patent should be held void for the failure to disclaim within a reasonable time. See Marconi Wireless Telegraph Co. v. United States, 320 U. S. 1, 59, 60, 63 S.Ct. 1393, 87 L.Ed. 1731. But we find no sufficient justification for imputing the knowledge of its invalidity ab initio to the patentees and their assignee, the plaintiff, in view of the complexity of the subject matter and the action of the Patent Office

in allowing it, and we believe they should not be held chargeable with such knowledge heretofore.

⬛ The remaining point concerns only the denial of the defendants' motion to dismiss the complaint on the ground that the United States was the equitable owner of the patent and no suit upon it may be maintained. No question as to the right of the United States to sue on a patent it owns need be decided for that issue is not here. The Alien Property Custodian did not vest any of the assets of the plaintiff but only its enemy-owned stock. At most the Custodian in behalf of the United States became a stockholder in the plaintiff to the extent of al' of its common stock and forty per cent of its preferred. He got only the rights of such a stockholder and no title to its property. Hamburg-American Line T. & N. Co. v. United States, 277 U. S. 138, 48 S.Ct. 470, 72 L.Ed. 822; Sutherland, Alien Property Custodian v. Selling, 9 Cir., 16 F.2d 865, certiorari denied, 273 U.S. 760, 47 S.Ct. 475, 71 L.Ed. 878. And so the plaintiff remained the owner of the patent entitled to sue for its infringement.

The decree should be modified to hold Claim 4 invalid but it is otherwise affirmed and the cause is remanded for the entry of a decree in accordance with this opinion. No costs in this court.

FRANK, Circuit Judge (dissenting in part).

I agree that Claim 4 is invalid. I do not agree that Claim 2 is valid.

1. The specifications begin with the statement, "This invention relates to poly iodized derivatives of the hydroxy diphenyl carboxylic acids and a *process for preparing the same.*"[1] But, significantly, the claim itself is solely for a product without regard to the process by which it is made; it contains no reference of any sort, direct or indirect, to the specifications.

Although there are statements in some decisions to the effect that a claim for a product may be valid, entirely apart from the process by which it is made, most of those statements, on careful examination of the opinions, turn out to be dicta.[2] The case most frequently cited to sustain such a product claim is Maurer v. Dickerson, 3 Cir., 113 F. 870. The court there said (page 874) that a patent for a product, no matter by what process produced, can be valid. But that statement was dictum. For the court (page 874) said that the evidence showed that the product could not be made "in any other way than by the process recited"; that (page 876) the article sold by defendant was the same as that specified in the patent claim; and that therefore (page 877) infringement was sufficiently shown "even if the claim were held to be limited * *. * to the product when made with the materials and by the process described in the specification." In support of the dictum in the Maurer case, the court cited Merrill v. Yeomans, 94 U. S. 586, 24 L.Ed. 235. But, in the Merrill case, the court held that the plaintiff's claim was limited to the process, and did not pass on the validity of a claim for the product alone. The Maurer case also cited Rubber Co. v. Goodyear, 9 Wall. 788, 19 L.Ed. 566; there the court sustained what might appear to be a product claim, but that claim (page 795) referred to "the new manufacture"; and in Smith v. Goodyear Dental Vulcanizing Co., 93 U. S. 496, 23 L.Ed. 952, a claim thus worded was held so to incorporate the specifications that it was a claim merely for a product made by the process described in the specifications; see also Goodyear Dental Vulcanizing Co. v. Davis, 102 U. S. 222, 26 L.Ed. 149.[3] In Binney & Smith Co. v. United Carbon Co., 4 Cir., 125 F.2d 255, 258, the court, citing cases, said that unquestionably there could be a valid claim for a product alone regardless of the process; but that decision was reversed in United Carbon Co. v. Binney & Smith, 317 U. S. 228, 63 S. Ct. 165, 87 L.Ed. 232, where grave doubts are cast upon any such doctrine. See also General Electric Co. v. Wabash Corp., 304 U. S. 364, 373–374, 58 S.Ct. 899, 82 L.Ed. 1402; Musher Foundation Co. v. Alba Trading Co., 2 Cir., 150 F.2d 885, 889.[4]

A claim for a mere product, regardless of the process for producing it, is, I think, virtually a claim to what has sometimes been described as a "principle" or "idea,"

---

[1] Emphasis added.

[2] Typical is Hide-ite Leather Co. v. Fiber Products Co., 1 Cir., 226 F. 34, 36.

[3] But see Dunn-Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co., 6 Cir., 259 F. 258, 261.

[4] Cf. Steinfur Patents Corp. v. Wm. Beyer, Inc., 2 Cir., 62 F.2d 238, 241; Buono v. Yankee Maid Dress Corp., 2 Cir., 77 F.2d 274, 277.

held not to be patentable. [5] It is indeed something of a paradox, but, nevertheless, doubtless wise, that our patent law gives no reward to the discoverers of scientific principles, [6] while it protects the discoveries and inventions of lesser minds, who find new, original and useful applications of such principles. [7] No Prometheus is welcome in the Patent Office. [8] Particularly in the field of chemistry, it would seem most unlikely that Congress intended that blanket claims to mere products should be held valid. [9] If the statutory provision authorizing the issuance of a patent for a "composition of matter" were interpreted to validate such claims, then that statutory provision might well be unconstitutional, since it would authorize the creation of monopolies which "would discourage arts and manufactures."[10] It is of interest that, for many years, Germany has not granted patents for chemical products; that the patent here was taken from German patents; and that those patents were for process, not product, claims, since they read: "Procedures for the production of, etc.," and "Methods of carrying out the procedure, etc."

For the foregoing reasons I think Claim 2 is invalid, being on its face, as my colleagues concede, "nothing but a chemical formula."

2. The specifications say: "The invention may be illustrated by the following examples without, however, being limited by them," and then proceed to give what my colleagues describe as "eight specific examples of ways to practice the invention," i. e., methods or processes for making the products described in the claims. My colleagues state (and correctly) that the evidence at the trial showed that "compliance with the instructions in Example 4 in the specifications by a skilled chemist produced the identical product of Claim 2." My colleagues also say that that claim is to be read on the specifications. The precise position of my colleagues is not entirely clear. They may mean that the claim is to be interpreted as if it read as do the German patents, i. e., as if it were restricted to a product produced by the process described in Example 4 or any reasonably similar equivalent. That is not the position taken by plaintiff in the trial court or in this court; indeed, I think it could scarcely so assert in the light of the language of the specifications as to not being limited by the examples given. If, however, plaintiff were to take that position, I would question its tenability. For recent decisions of the Supreme Court indicate that it is extremely doubtful whether a broad claim which, standing by itself, would be invalid, can be saved by limiting it through reading into it the specifications, *where as here nothing in the claim in any way refers to the specifications.* [11] Accordingly, I doubt

5 LeRoy v. Tatham, 14 How. 156, 174-176, 14 L.Ed. 367; LeRoy v. Tatham, 22 How. 132. 16 L.Ed. 366; O'Reilly v. Morse, 15 How. 62. 112-114, 14 L.Ed. 601; Burr v. Duryee, 1 Wall. 531, 577, 17 L.Ed. 650; De Forest Radio Co. v. General Elec. Co., 283 U.S. 664, 684, 685, 51 S.Ct. 563, 75 L.Ed. 1339; Katz v. Horni Signal Mfg. Co., 2 Cir., 145 F.2d 961; cf. Buono v. Yankee Maid Dress Corp., 2 Cir., 77 F. 2d 274, 279; Fowler v. City of New York, 2 Cir., 121 F. 747, 748; Hotel Security Checking Co. v. Lorraine Co., 2 Cir., 160 F. 467, 469, 24 L.R.A.,N.S., 665. But see Dennis v. Pitner, 7 Cir., 106 F.2d 142.

6 See cases cited in the preceding footnote.

Promise of financial reward is usually not necessary to stimulate the minds of scientific geniuses; Kaempfert, Invention and Society (1930) 19, 23-24, 33; Douglas, The Reality of Non-Commercial Incentives, in The Trend of Economics (1924) 153; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 642.

7 Katz v. Horni Signal Mfg. Corp., 2 Cir., 145 F.2d 961, 963.

8 Katz v. Horni Signal Mfg. Corp., 2 Cir., 145 F.2d 961.

9 Cf. De Lore v. St. Louis Lithophone Co., 8 Cir., 26 F.2d 864, 868; Western Willite Co. v. Trinidad Asphalt Mfg. Co., 8 Cir., 16 F.2d 446, 450; Libby-Owens-Ford Co. v. Celanese Corp., 6 Cir., 135 F.2d 138, 145; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610; Kalle & Co. v. Mulatzo Co., 6 Cir., 109 F.2d 321; American Chemical Paint Co. v. Firestone etc. Co., 6 Cir., 117 F.2d 927; Metals Recovery Co. v. Anaconda Copper Mining Co., 9 Cir., 31 F.2d 100, 103; cf. United Carbon Co. v. Binney Co., 317 U.S. 228, 232-233, 63 S.Ct. 65, 87 L.Ed. 232.

10 LeRoy v. Tatham, supra; O'Reilly v. Morse, supra; United Carbon Co. v. Binney Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232; Muncie Gear Works v. Outboard Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

11 General Electric Co. v. Wabash, supra, 304 U.S. 364 at pages 373-374, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney Co., 317 U.S. 228,

whether we can read into Claim 2 anything found in the specifications so as to validate it by limiting the claim to a product made by a process described in the specifications. [12]

But I understand that what my colleagues really mean is this: As the specifications, by disclosing one specific practical method, show that the product described in Claim 2 can practically be made, plaintiff has a valid patent to that product, no matter how it is made—whether according to Example 4 or any other process now known or which may hereafter be devised; and that is the position taken by plaintiff. With that position I disagree, for reasons stated above.

3. If the claim could be and were validated by narrowing it to one for the product when made according to a method described in the specifications, then defendants should win for lack of proof of infringement. True, defendants' counsel at the trial admitted that, if the claim was valid, defendants had infringed it. But as, at the trial, plaintiff took the position that Claim 2 was for the product regardless of any process for producing it, defendants' admission should not be construed as meaning more than that their product was identical with plaintiffs. No proof whatever was made or offered that defendants used plaintiff's process or any reasonably similar equivalent. Absent such proof, where a patent is for a product resulting from a specific process or its equivalents infringement does not exist.[13] If this court were to reject plaintiff's interpretation of the claim (i. e., as a claim to a product as such) and to interpret it for the first time on appeal as one to a product resulting from a specific process, then the court should not change the character of defendants' concession, i. e., treat it as an admission that the defendants used plaintiff's process to manufacture the product. In that event we should hold that the patent has not been infringed. If, however, there were thought to be any doubt as to the scope of the defendants' admission, then we should, at most, remand for further evidence, "to the end that injustice may not be done." [14]

---

234–235, 63 S.Ct. 165, 87 L.Ed. 232; cf. Altoona Theatres v. Tri-Ergon Corp., 294 U.S. 477, 487, 55 S.Ct. 455, 79 L.Ed. 1005; McCarty v. Lehigh Valley R. Co., 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358. But see Mitchell v. Tilgham, 19 Wall. 287, 391, 22 L.Ed. 125; Downes v. Teter-Heany Development Co., 3 Cir., 150 F. 122, 123; Pickhardt v. Packard, C.C.N.Y. 22 F. 530, 531–532; Western States Machine Co. v. Hepworth Co., 2 Cir., 147 F.2d 345, 349; R. M. Hollingshead Co. v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543, 548.

In Musher Foundation, Inc. v. Alba Trading Co., Inc., 2 Cir., 150 F.2d 885, 889, this court, in discussing General Electric Co. v. Wabash Appliance Co., supra, considered only the portion of that opinion found on page 373 of 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 and neglected the remarks on page 374 of 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 and the cases there cited; and it gave no heed to the reference to the General Electric case in the United Carbon Co. case, supra, 317 U.S. 228, at page 235, 63 S.Ct. 165, 87 L.Ed. 232.

12 A patent for a product resulting from a process may be highly desirable to prevent competition by those who use the process in other countries to make the product which they import into this country. Cf. General Electric Co. v. Wabash Co., 304 U.S. 364, 374, 58 S.Ct. 899, 82 L.Ed. 1402; Buono v. Yan-kee Maid Dress Corp., supra, 77 F.2d 274 at page 279; Musher Foundation, Inc. v. Alba Trading Co., Inc., supra, 150 F.2d 885, at page 889.

13 See, e.g., Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 313, 4 S.Ct. 455, 28 L.Ed. 433; Plummer v. Sargent, 120 U.S. 442, 450, 7 S.Ct. 640, 30 L.Ed. 737; Hide-ite Leather Co. v. Fiber Products Co., 1 Cir., 226 F. 34; Corning v. Burden, 15 How. 252, 268, 14 L.Ed. 683; Burr v. Duryee, 1 Wall. 531, 572, 17 L.Ed. 650; Westinghouse v. Boyden Brake Co., 170 U.S. 537, 569, 18 S.Ct. 707, 42 L.Ed. 1136; Swan Carburetor Co. v. Chrysler Corporation, 6 Cir., 130 F.2d 391, 393; Flowers v. Magor Car Corporation, 3 Cir., 65 F.2d 657, 658; Flowers v. Austin-Warren Co., 7 Cir., 149 F.2d 955, 958.

14 Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 136 F.2d 845, 848; Nachmann Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, 787; Zalkind v. Scheinman, 2 Cir., 139 F.2d 895, 904; United States v. Rio Grande Dam & Irrigation Co., 184 U.S. 416, 423, 424, 22 S.Ct. 428, 46 L.Ed. 619; Estho v. Lear, 7 Pet. 130, 8 L.Ed. 632; Armstrong v. Lear, 8 Pet. 52, 74, 8 L.Ed. 863; Security Mortgage Co. v. Powers, 278 U.S. 149, 159, 160, 49 S.Ct. 84, 73 L.Ed. 236; Pfeil v. Jamison, 3 Cir., 245 F. 119; Wyant v. Caldwell, 4 Cir., 67 F.2d 374; Columbus Gas & Fuel Co. v. City of Columbus, 6 Cir., 55 F.2d 56, 58.